# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| MAVERICK THERAPEUTICS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| and | ) |
| | ) |
| MILLENNIUM | ) |
| PHARMACEUTICALS, INC., | ) |
| | ) |
| Plaintiff-Intervenor, | ) |
| | ) |
| v. | ) C.A. No. 2019-0002-SG |
| | ) |
| HARPOON THERAPEUTICS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Date Submitted: December 17, 2020
Further Submission: March 24, 2020
Date Decided: April 23, 2021

Jody C. Barillare, of MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware; OF COUNSEL: Rollin B. Chippey II and Benjamin P. Smith, of MORGAN, LEWIS & BOCKIUS LLP, San Francisco, California, *Attorneys for Plaintiff*.

John P. DiTomo, Elizabeth A. Mullin, and Aubrey J. Morin, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: John Ruskusky and Lisa C. Sullivan, of NIXON PEABODY, LLP, Chicago, Illinois, *Attorneys for Plaintiff-Intervenor*.

Gregory P. Williams, Steven J. Fineman, Nicole K. Pedi, and Angela Lam, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Martin S. Schenker and Lilia Lopez, of COOLEY LLP, San Francisco, California and Jeffrey Karr, of COOLEY LLP, Palo Alto, California, *Attorneys for Defendant*.

GLASSCOCK, Vice Chancellor

This matter involves fraud in the sale of a spin-off designed to develop anti-cancer technology. The matter has been tried, and I issued a Memorandum Opinion finding that the seller had committed fraud;[1] what follows is my decision on damages.

The foregoing is the gravamen of the legal action, but this will not, I hope, cause the reader to become jaundiced to the (to a lay person) near miraculous technology being developed by the entities involved. This is described in more detail below (still at an elementary level) but involves recruiting the body's natural defenses, T cells, and inducing them to safely destroy cancerous tumors with minimal damage to healthy cells. That there are people alive today who can recall a time before the development of antibiotics is testament to the enormous advances science has made in the preservation of human health, and the lessening of human suffering. That those in this field are themselves human and subject to the human failings that are the lot of mankind should not diminish this fact.

The defendant, Harpoon Therapeutics, Inc. ("Harpoon") spun off the technology referred to above into a new entity, Maverick Therapeutics, Inc. ("Maverick"). Plaintiff-Intervenor Millennium Pharmaceuticals, Inc. ("Millennium") is a wholly-owned subsidiary of Takeda Pharmaceutical Company

---

[1] *See generally Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948 (Del. Ch. Apr. 3, 2020) [hereinafter *Maverick I*].

Limited ("Takeda"). Millennium agreed, through a complex "build-to-buy" agreement, to fund Maverick's research in exchange for the option to eventually purchase the company. The fraud involved misrepresentations about the scope of the protection the new entity would enjoy from competing with its parent and seller, Harpoon. Millennium believed Maverick would be broadly free from Harpoon's competition in the inducible T cell field for four years. This was particularly important to Millennium, as Harpoon had created the technology being sold, and was thus in a position to create other such competing technology, and because Harpoon had some of the most-recognized talent in the field in its employ, talent that was supposed to assist in the development of the Maverick technology. As Millennium feared, Harpoon developed a new inducible T cell concept that may ultimately compete with Maverick's. I found that while this was contractually permissible in terms of the complex non-compete agreed to by Harpoon and Maverick, it was was contrary to the misleading representations Harpoon made to Millennium to induce its investment.

Resolution of the damages question is, in theory, simple. What is the difference between what Millennium thought it had purchased, and what it actually got as a result of Harpoon's fraud? Getting to a sum certain in practice is less simple, as evidenced by the stark discrepancy between the valuations offered. The help provided to me as finder of fact by the parties' respective experts is reminiscent of

2

that given me by valuation experts in those long-ago appraisal litigations of the twenty-teens: here, Millennium's expert opines that the damages derived (using the Capital Markets Approach) are $146.65 million, far exceeding the investment price itself. Harpoon's expert reckons that damages are as low as $400,000; that is, approximately 1/367th of the damages estimated by Millennium's expert.

Investment into such arcane medical arenas incorporates quite significant risk. There are many hurdles, both technical and regulatory, before a novel treatment goes from concept to actual application to human beings. Many ventures never provide any return on investment. The build-to-buy investment Millennium agreed to make in Maverick can thus be analogized to the purchase of a lottery ticket, a risky investment with a low probability of a large pay-out. This limited analogy unfairly omits the sweat and effort, even genius, required to bring to market a cancer treatment that could, if successful, meaningfully change many human lives. Nonetheless, in considering damages, it is a useful analogy, and I employ it here. To calculate Millennium's damages, then, is to calculate the difference between two lottery tickets: the ticket Millennium thought it had purchased, and the ticket it received as a result of Harpoon's fraud.

What was the value of that first lottery ticket? That is, what is the value of Millennium's investment in light of its reasonable belief that it was getting a broad four-year non-compete from Harpoon? I find that the best evidence of the value of

what Millennium thought it was getting comes from the arms-length negotiations between Harpoon on the one hand, and Maverick/Millennium on the other. Millennium invested in an entity that owned technology, and the facility to develop it, that, if the lottery long-shot came through, could have enormous value. The price to which these parties agreed necessarily factors in the low probability of ultimate success as well as the potentially large pay-off upon such success. Thus, the value of Millennium's reasonable expectations is defined by what it agreed to invest, reduced to present value as of the date of that agreement.

More challenging is valuing the lottery ticket Millennium ultimately got. The comparatively narrow non-compete Harpoon agreed to did not diminish Maverick's chances of successfully monetizing an inducible T cell engager. The reduced scope of the non-compete does affect the potential pay-off, however. If Maverick had the inducible T cell field to itself for four years, and if it was able to bring the technology to commercial viability, it would likely be the first in the market, implying a lucrative position for its product. With only the narrow non-compete, Maverick could find itself in contemporaneous competition with Harpoon, which, as it turned out, is precisely what transpired; Harpoon is developing a competing inducible T cell cancer treatment. Thus, compared to the first lottery ticket, this second lottery ticket has the same chances of winning, but potentially a smaller prize. Clearly, a lottery

4

ticket with a 1% chance of winning $1,000 is worth less than one with a 1% chance of winning $1 million.

Neither Harpoon nor Maverick, today, is certain of monetizing these products—both remain long shots. Similarly, at the time of Harpoon's fraud, its ability to develop a drug to compete with Maverick's was only a possibility; still, it was one foreseen and intended by Harpoon. It referred to that possibility—Maverick and Harpoon entering the market as contemporaries—by the memorable name "T[akeda]'s Nightmare," Takeda being the parent of Millennium [2]

In summary, one of the things Millennium though it was paying for when it invested in Maverick was the promise that Takeda's Nightmare would never become reality. The value of that promise was included in the price Millennium was willing to pay, and if Millennium knew it wasn't receiving that promise it would have paid less, if it transacted at all. The narrower non-compete that Maverick and Harpoon agreed to instead didn't make that same promise, and while that didn't ensure Takeda's Nightmare, it didn't protect Millennium from it either. The possibility of Takeda's Nightmare, a possibility created by Harpoon's fraudulent representations as to the scope of the non-compete, decreased the value of Millennium's investment. Millennium got less than what it was promised and was damaged in the amount of

---

[2] *Maverick I*, at *11. I refer to the possibility that Maverick would find itself with Harpoon as a contemporaneous competitor in the inducible T cell field as "Takeda's Nightmare" throughout.

5

the value of that unfulfilled promise.  The difference between the value of the narrow non-compete that Maverick ultimately got compared to the broader protection that Harpoon caused Millennium to believe Maverick would enjoy represents the tort damages here.  Those damages must be derived as of the time of the tort, when Takeda's Nightmare was still only a possibility.

Thus, Millennium has demonstrated it has been defrauded, and damaged as a result.  In reducing those damages to an award, I must have a rational basis to derive them, but damages need not be proven with mathematical certainty, else the tortfeasor would be potentially beyond the reach of justice.  Here, I first value Millennium's investment in light of a broad Harpoon non-compete—represented by the then-present value of what Millennium negotiated and agreed to invest in contemplation of such a non-compete.  Next, I value that investment in light of Takeda's Nightmare; that is, with Maverick entering the market with a contemporaneous competitor, rather than a unique product, as made possible by the actual, narrow non-compete.  Such a splitting of the market would, logically but simplistically, reduce the value of a monetized Maverick product—the pay-off if Maverick wins the lottery—by half, I conclude.  Because that potential pay-off drove the present value of Millennium's investment, I determine that the investment would lose half its value in case Takeda's Nightmare came to pass.

But half of the investment value overstates the damages. At the time of investment, Harpoon's ability to develop the technology leading to Takeda's Nightmare was not a sure thing—thus the value of the non-compete must be re-reduced accordingly. At oral argument, Harpoon's counsel referred to the possibility of Harpoon becoming a contemporaneous competitor, even given the narrow non-compete, as one-in-four, or less. I find Harpoon too modest in this assertion, however. Harpoon pioneered the inducible T cell field. It employs some of the best scientists in that field, cryptically working against Maverick's interest. Harpoon must have had confidence in its ability to compete, otherwise it would not have bothered to defraud Millennium. In light of that record, I find that the value of the non-compete should be discounted by no more that 20% to account for the fact that, even with the narrow non-compete, Takeda's Nightmare was not inevitable.

In other words, I conclude that the value of Millennium's investment in Maverick with Harpoon as a contemporary competitor was half of what it would have been with the market to itself, and that as of the time of the fraud, the uncertainty that (absent a broad non-compete) Harpoon would become such a competitor reduces the value of a prohibitory non-compete by 20%. I thus conclude an investor would pay 80% of 1/2 (that is, 40%) less than the original investment in light of the narrow non-compete. The result of the fraud, therefore, was that Millennium received for its investment an entity reduced in value by 40%. That

amount is derived below; Millennium is entitled to receive that amount in damages, with pre-judgment interest.

## I. BACKGROUND[3]

*A. Nature of the Action*

This post-trial Memorandum Opinion resolves the damages phase of a lawsuit brought by plaintiff Maverick against defendant Harpoon. I previously found that Harpoon had fraudulently induced Millennium, Takeda's wholly-owned subsidiary, to invest in Maverick by representing that Harpoon would not compete with Maverick's development of conditionally active T cell engager therapies for four years.[4] A more abundant recitation of the facts leading to that finding can be found in my Memorandum Opinion of April 3, 2020.[5] Here, I recount only the facts relevant to my finding on damages.

---

[3] I recite the facts as I find them based upon the evidence submitted by the parties. Unless otherwise noted, the facts in this Background were stipulated by the parties or proven by a preponderance of evidence. To the extent there was conflicting evidence, I have weighed the evidence and made findings based on the preponderance of the evidence. In pursuit of brevity, I sometimes omit from this Background discussion testimony in conflict with the preponderance of the evidence. In such cases, I considered the conflicting testimony, and I rejected it. Citations to Joint Trial Exhibits ("JX") are expressed as JX __, at __. Page numbers for JXs are derived from the stamp on each JX page. For clarity, certain citations to JXs reference the section number of a document (§) instead of the JX page. Citations in the form "Tr." refer to the trial transcripts. Citations in the form "Stip. ¶ __" refer to the parties' several stipulations of fact.

[4] *See generally Maverick I*. Capitalized terms not defined herein are defined in *Maverick I*.

[5] *See id.*

*B. Harpoon Develops TriTAC and ProTriTAC*

Harpoon was founded by non-parties Dr. Luke Evnin and Dr. Patrick Baeuerle to develop marketable cancer treatments.[6] At the time Harpoon was founded, T cell therapies were a growing area of cancer drug development.[7] "T cells" are white blood cells that target and kill other cells in the body, usually those that are infected with viruses or pathogens.[8] T cell therapies treat cancer by using the body's own defenses, the T cells, to kill cancer cells.[9] A patient undergoing T cell therapy receives injections of "T cell engagers," protein molecules designed in a laboratory, that bind to, or "recruit," the body's T cells to destroy the cancer.[10] However, because T cells are indiscriminate killers, T cell therapies also risk harming the patient by destroying healthy cells.[11]

T cell therapy has only been approved by the FDA for treating one category of cancers: blood cancers.[12] In blood cancers, like leukemia, T cell therapies prove successful because even though the T cells kill both malignant and healthy blood cells, the body regenerates blood quickly enough to minimize harm to the patient.[13] The same cannot be said for the other major category of cancer: solid tumor

---

[6] *See id.* at *2.
[7] *See id.*
[8] *See id.*
[9] *See id.*
[10] *See id.*
[11] *See id.*
[12] *See id.* at *3.
[13] *See id.* at *2.

cancers.[14]  Harpoon's goal was to solve this problem; it sought to produce a T cell therapy that could safely treat solid tumor cancers while leaving most healthy cells intact.[15]

As noted above, the T cell engagers used in T cell therapy work by binding the body's T cells and cancer cells together so that the T cells kill the cancer cells.[16] The structure of the T cell engager, which is a protein molecule, includes "binding domains," protein structures that bind, or "engage" certain cells.[17]  In the context of cancer treatment, T cell engagers generally have a "T cell engaging domain" to bind to T cells and a "cancer targeting domain" to bind to cancer cells.[18]  The term "binding affinity" is used to describe how well the binding domain does its job.[19] The stronger the bind, and/or the longer it lasts, the more binding affinity the binding domain has.[20]

T cell engagers are either "inherently active" or "conditionally active."[21] Inherently active T cell engagers are capable of binding T cells to cancer cells at all

---

[14] *See id.*
[15] *See id.* at *2–*3.
[16] *See id.* at *2.
[17] *See id.*
[18] *See id.*
[19] *See id.* at *4.  Binding affinity can describe a molecule as a whole or individual binding domains on a molecule.  *Id.* at *4, n.53.  Each binding domain, sometimes called a "binding site," can have a unique binding affinity and the binding affinity of each may differ from that of the others as well as from that of the whole molecule, depending on context.  *Id.* at *3, *4, n.53.
[20] *See id.* at *4.
[21] *Maverick I* at *3.  Conditionally active therapies are also referred to as "inducible" therapies, meaning the therapy drug's active state is induced at the tumor site.  *Id.*

times, or, in other words, they always possess binding affinity.[22] In conditionally active therapies, also referred to as "inducible" therapies, the T cell engager only binds cells together when cancer cells are present.[23] As of the initial trial in this matter, the FDA had not approved any conditionally active T cell therapies.[24]

In seeking to develop a successful conditionally active therapy, Harpoon's first innovation was to design a molecule with three binding domains.[25] In addition to binding T cells and cancer cells, this molecule bound to a protein normally found in the blood called albumin.[26] This third binding domain, called the "half-life extension domain" would prolong the T cell engager's existence in the body, giving it more time to work.[27] Harpoon called the first advancement—prolonging the life of the therapy drug through albumin binding—its "TriTAC" platform.[28] TriTAC is an inherently active T cell engager.[29]

Next, Harpoon designed a second molecule that, like TriTAC, had three binding domains. Unlike TriTAC, the new concept was conditionally active. Cancer cells release certain unique enzymes, or "proteases."[30] Harpoon's

---

[22] *See id.*
[23] *Id.* at *3.
[24] *Id.* at *3; Stip. ¶ 18, Dkt. No. 233 (granted orally).
[25] *Maverick I* at *3.
[26] *Id.*
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*

11

conditionally active T cell engager would only recruit T cells in the presence of these unique proteases.[31] Harpoon called the second advancement—keeping the drug inactive until in the presence of a cancer cell—its "ProTriTAC" platform.[32]

### C. The Maverick Spin-Out

Around the time of the patent filing, in early 2016, Harpoon began considering selling off portions of its technology portfolio.[33] Of the companies it reached out to, Takeda expressed the most interest.[34] The parties initially centered on a dual build-to-buy structure—Harpoon would transfer certain technologies to a new company, Maverick, and Takeda's subsidiary Millennium would invest in both Harpoon and Maverick in exchange for options to purchase either or both at a later date.[35]

Much of the early negotiations centered on dividing the technologies that Maverick would focus on from the technologies that Harpoon would focus on.[36] Harpoon represented to Millennium that it would work on the TriTAC platform—or inherently active technology—and Maverick would work on the ProTriTAC platform—or conditionally active technology.[37]

---

[31] *Id.*
[32] *Id.* at *3–*5.
[33] *Id.* at *5.
[34] *Id.*
[35] *Id.*
[36] *Id.* at *6.
[37] *Id.* at *6–7.

Millennium eventually expressed interest only in Harpoon's ProTriTAC platform, in other words, the inducible technology to be spun out into Maverick.[38] Instead of Millennium investing in both Harpoon and Maverick, the parties proceeded with negotiations toward a single build-to-buy.[39] Millennium would invest in Maverick and Harpoon would remain an independent company.[40]

Harpoon spun off Maverick in December 2016.[41] An Asset Transfer Agreement (the "ATA") between Maverick and Harpoon governed the spin-out.[42] Under Section 7.5 of the ATA, Harpoon agreed that it would not compete with Maverick in the "Maverick Field" for four years.[43] At the time Maverick and Harpoon entered the ATA, its definition of the Maverick Field encompassed all then-existing, conditionally active T cell engagers.[44]

In addition to intellectual property, various assets related to the Maverick Field were transferred to Maverick under the ATA.[45] Several employees also joined

---

[38] *Id.* at *8.
[39] *Id.* at *7–*8.
[40] *Id.*
[41] *Id.* at *12.
[42] *Id.*
[43] *Id.* The ATA defines the Maverick Field "as multi-specific Antigen-binding molecules that include: (a) at least one domain that binds to an Immune Effector Target that (i) is formed from two domains, each of which is impaired for Immune Effector Target binding, and (ii) undergoes a resultant increase in Immune Effector Target binding affinity of at least 50 fold after an activation event; (b) at least one domain that binds to one or more Therapeutic Targets; and (c) at least one half-life extension domain, which domains (a) through (c) may be linked in various orders." *See id.*
[44] *Id.* at *13.
[45] *Id.*

Maverick from Harpoon: Evnin became the chair of the Maverick Board; Baeuerle became an observer of the Maverick Board; and both of them joined the "Takeda-Maverick Joint Steering Committee."[46] They both also continued to serve on the Harpoon Board.[47]

As part of the spin-out, Millennium, which was not a party to the ATA, acquired 19.9% ownership of Maverick via a $10 million investment in Maverick's Series B Shares.[48] Maverick and Millennium also entered into a Collaboration Agreement (the "Collaboration Agreement"), which provided for regular infusions of funding from Millennium, as well as a Warrant to Purchase Common Stock of Maverick Therapeutics, Inc. (the "Warrant Agreement" and together with the Collaboration Agreement and the ATA, the "Agreements"), which provided Millennium the right to later acquire Maverick.[49]

*D. Harpoon Announces the New ProTriTAC and Maverick Sues*

Prior to the spin-out, Harpoon never informed Millennium that it intended to develop conditionally active T cell therapies that would potentially compete with Maverick's.[50] In public statements after the spin-out, Harpoon continued to describe the companies in a way that confirmed Millennium's understanding of each

---

[46] *Id.* at *12.
[47] *Id.*
[48] Stip. ¶ 63, Dkt. No. 401.
[49] *Maverick I* at *12.
[50] *Id.*

company's trajectory as distinct.[51]  However, Harpoon began generating ideas for a new conditionally active T cell therapy that would be outside the scope of the Maverick Field as early as January 2017.[52]  Less than two weeks before the spin-out, Evnin and Baeuerle discussed how to avoid the scope of the noncompete the parties were negotiating; an evasion Baeuerle memorably described as "T's [Takeda's] Nightmare."[53]

In June of 2017, Harpoon hired Dr. Jack Lin, in part to help develop conditionally active therapies.[54]  Although Lin came to Harpoon with no direct experience with T cell engagers, he had experience with antibodies, proteases, and "peptide masking," a technique with the potential to make protease-activated inducible therapies.[55]  Within two weeks of employment at Harpoon, he had a scientific epiphany—a "serendipitous eureka moment."[56]  By incorporating a peptide mask into part of the albumin binding domain (the third binding domain of the TriTAC molecule), he could achieve conditional activity.[57]

In contrast to Maverick's T cell engager, since renamed COBRA, the T cell binding domain on Harpoon's new ProTriTAC molecule is sheathed behind a

---

[51] *Id.* at *13.
[52] *Id.*
[53] *Id.* at *12.
[54] *Id.* at *15.
[55] *Id.*
[56] *Id.*
[57] *Id.*

peptide mask on the albumin binding domain that prevents it from recruiting T cells.[58]  Instead of binding to T cells, the binding site is bound to the mask.[59]  When introduced to unique proteases present in a cancerous tumor, the peptide mask is removed and the binding site can freely recruit T cells.[60]

Harpoon informed Maverick of its newly-developed conditionally active technology a few days before publicly announcing the platform at the 2018 annual meeting of the Society for Immunotherapy of Cancer ("SITC") in Washington, D.C.[61]  Baeuerle called Maverick CEO Jim Scibetta and told him that Harpoon was developing a conditionally active T cell engager.[62]  Scibetta then spoke with Evnin, who confirmed that Harpoon was in fact competing with Maverick.[63]  At the SITC conference, Harpoon announced its new molecule, ProTriTAC, and offered proof-of-concept data.[64]  Two days later, Harpoon announced the closing of a $70 million Series C financing round, part of which would be used to develop its ProTriTAC platform.[65]  Over the next week, Scibetta had several meetings and phone calls with Harpoon, during which he learned that ProTriTAC had been in development ever

---

[58] *See id.* at *12, *16.
[59] *Id.* at *16.
[60] *Id.*
[61] *Id.* at *19.
[62] *Id.*
[63] *Id.*
[64] *Id.*
[65] *Id.*

since the spin-out.[66] Maverick initiated this suit against Harpoon for, among other claims, breach of contract and misappropriation of trade secrets on January 3, 2019.[67] In my prior Memorandum Opinion, I resolved these claims in Harpoon's favor based largely on the language of the ATA.[68]

### E. Millennium's Fraud Claim

Millennium intervened, asserting claims against Harpoon for: (1) tortious interference with business relations; (2) tortious interference with contract; (3) fraudulent inducement to contract; (4) unjust enrichment; (5) unfair competition; and (6) fraud.[69] After a six-day bench trial in September 2019 (the "Liability Trial"), I found sufficient evidence that Harpoon fraudulently induced Millennium into entering the Collaboration and Warrant Agreements, pending a determination of damages.[70]

Prior to the spin-out, Harpoon knowingly made false statements to Millennium with the intent to induce Millennium into investing in Maverick.[71] Based on those representations, Millennium reasonably believed it was purchasing rights to develop conditionally active T cell engagers without fear of competition

---

[66] *Id.*
[67] *See generally, e.g.*, Verified Compl. in Intervention, Dkt. No. 135.
[68] *Maverick I* at *37.
[69] *See* Verified Compl. in Intervention, Dkt. No. 135.
[70] I denied Millennium's claims for tortious interference with contract and business relations, for unfair competition, and unjust enrichment. *Maverick I* at *25–*37.
[71] *Id.* at *26–*30.

17

from Harpoon in that field.[72] Harpoon confirmed Millennium's understanding of the deal by representing Harpoon's and Maverick's trajectories as separate and exclusive.[73]

However, although Harpoon understood that Millennium had entered negotiations with a broad concept of investing in conditionally active T cell engagers, it clandestinely pursued Takeda's Nightmare.[74] Harpoon negotiated the ATA with the intent—which it took pains not to disclose—to limit the Maverick Field to certain technologies so that it could compete in the inducible space in the future.[75] Knowing that if Millennium learned of this intent, the Maverick Field would be renegotiated, Harpoon withdrew a patent application, postponed inventions, and encouraged silence rather than communication to avoid "raising the[] ire" of Millennium, who it had encouraged to interpret the Maverick Field differently.[76] Thus, while affirming Millennium's broad understanding of the Maverick Field, Harpoon maintained, through concealment and silence, its intent to continue innovation in the sector of immunotherapy that was proving attractive to investors.

---

[72] *Id.* at *30–*36.
[73] *See, e.g., id.* at *28–*29; JX 430; JX 681; JX 748.
[74] *See, e.g., Maverick I* at *28–*29; JX 246; JX 474; JX 476.
[75] *Id.* at *28
[76] *Id.* (quoting JX 500 at 1).

The description of the Maverick Field in the ATA is arcane and complex but not, I found, ambiguous. Nonetheless, based on the Defendant's representations, I found that Millennium reasonably believed that Harpoon's and Maverick's trajectories were divergent and that Harpoon's non-compete obligations were broad despite the lack of ambiguity in the Maverick Field definition.[77] Millennium witnesses also credibly testified at the Liability Trial that Millennium would not have invested in Maverick without the broad "ring fence" around conditionality that it believed Maverick would enjoy.[78] Accordingly, and assuming that Millennium suffered damages subject to proof at an ensuing damages phase, I found that the elements of fraud and fraudulent inducement were otherwise satisfied.[79]

*F. Millennium's Damages Calculations*

Conditionally active T cell engagers rely on several components, each of which requires effort and expenditure to develop.[80] The parties provided some

---

[77] *Id.* at *34–*36.
[78] *Id.* at *36.
[79] *Id.* at *36–*37. The elements of fraud and fraudulent inducement are the same:
  (1) a false representation, usually one of fact, made by the defendant;
  (2) the defendant's knowledge or belief that the representation was
  false, or was made with reckless indifference to the truth; (3) an intent
  to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's
  action or inaction taken in justifiable reliance upon the representation;
  and (5) damage to the plaintiff as a result of such reliance.
*Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829,
at *32 (Del. Ch. Dec. 3, 2018); *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074
(Del. 1983)).
[80] *Maverick I* at *17. Maverick witnesses estimated it spent 150,000 hours of research in
developing the COBRA molecule, including working over a year on the research necessary to
select the individual components. *Id.*

19

evidence of damages at the Liability Trial and supplemented that evidence at the subsequent damages trial on September 22, 2020 (the "Damages Trial").

Millennium's damages expert, Mr. Gregory Nachtwey, presented two approaches to calculating damages.[81] The "Capital Markets Approach"—similar to a contractual "benefit of the bargain" expectations analysis—estimated the diminution in value of Millennium's investment in Maverick due to Harpoon's fraud.[82] Nachtwey first determined an expected "enterprise value" for Maverick without competition from Harpoon, including Millennium's contributions under the Collaboration and Warrant Agreements and the value of the Warrant.[83] Nachtwey next estimated an enterprise value for Maverick with Harpoon competing for half of the same market and calculated the difference between the value of Millennium's investment in each scenario.[84] Nachtwey's "Cost Approach" assessed damages based on Millennium's payments pursuant to the Collaboration and Warrant Agreements.[85] He suggested that Millennium be awarded damages in the amount of the midpoint of the two approaches.[86]

---

[81] *See generally* JX 1059 (Nachtwey Expert Report).
[82] Liability Trial Tr. 1052:24–1053:8; JX 1059, 50–60.
[83] JX 1059, at 52–55.
[84] *Id.* 60.
[85] Liability Trial Tr. 1025:15–1026:16, 1048:1–1048:4.
[86] JX 1059, at 49.

Harpoon's expert, Dr. Mohan Rao, did not originally testify to a damages calculation that he believes is more accurate or appropriate.[87]  Instead he rebutted Nachtwey's calculations by arguing, for example, that Nachtwey's Capital Markets Approach is "circular" and that he failed to account for how unlikely either Harpoon or Maverick are to develop a successful final product, let alone compete in the same market.[88]

For the Damages Trial, both experts supplemented their original reports.[89] Nachtwey's supplemental report updated the calculations presented in his first report to their 2021 value.[90]  Using the Capital Markets Approach, Nachtwey estimated Millennium's damages to be $146.65 million.[91]  Using the Cost Approach, Nachtwey generated a damages estimate of $113.7 million.[92]  Weighted equally, these two approaches resulted in a blended damages calculation of $130.18 million.[93]

---

[87] Rao testified on direct examination at the Liability Trial but, due to time constraints, the plaintiffs submitted deposition designations in lieu of live cross-examination.  *See* Liability Trial Tr. 1941–1943, 1952–1973.  In his deposition, Rao stated "I think it's fair to say that I do not have an affirmative damages number assuming liability."  Rao Dep. 73.

[88] Liability Trial Tr. 1968:17–1969:12.  Rao suggested, at the low end, a 2% chance of success and at best an 8% chance.  *Id.* 1968:23–1969:4.

[89] *See generally* Tr. of Damages Trial via Zoom, Dkt. No. 387 [hereinafter Damages Trial Tr.]; JX 1421 (Nachtwey Suppl. Expert Report); JX 1424 (Nachtwey Sur-Rebuttal Report); JX 1622 (Rao Suppl. Report).

[90] *See, e.g.*, Damages Trial Tr. 10:7–68:1; JX 1421.

[91] Damages Trial Tr. 11:12–11:17.

[92] Damages Trial Tr. 11:18–11:21.

[93] Damages Trial Tr. 10:21–10:24, 67:18–67:23.

Rao maintained that Nachtwey's approach dramatically overestimates Millennium's damages. Based on his view of how unlikely the two companies are to actually compete, Rao adjusted Nachtwey's valuation under the Capital Markets Approach down by his estimation of the probabilities that Harpoon commercializes a product—two, six, and eight percent.[94] This adjustment suggests Millennium's damages are between $4 million and $17 million.[95] He also adjusted for a 10% chance of direct competition between Maverick and Harpoon, suggesting that Millennium is instead entitled to somewhere between $400,000 and $1.7 million.[96]

Under the Collaboration and Warrant Agreements, Millennium committed to invest $112 million in Maverick.[97] Some of that was to be paid over the next four years.[98] It is undisputed that Millennium has made all the required payments through the first quarter of 2021.[99] Millennium's ownership interest in Maverick has remained 19.9% since closing the transaction.[100]

---

[94] JX 1622, at 60.
[95] *Id.*; Damages Trial Tr. 186:13–190:2.
[96] JX 1622, at 63; Damages Trial Tr. 190:15–193:13.
[97] *E.g.*, Stip. ¶ 64, Dkt. No. 401.
[98] *Id.*
[99] *See* Stip. ¶ 68, Dkt. No. 409.
[100] Stip. ¶ 63, Dkt. No. 401.

## G. Procedural History

Maverick filed its complaint and a motion for a temporary restraining order ("TRO") on January 3, 2019.[101]  I denied the TRO on January 18, 2019.[102]  On April 30, Millennium filed a Motion to Intervene.[103]  I granted the Motion to Intervene on May 8, and Millennium filed its complaint on May 14.[104]  The Liability Trial took place September 9–13 and 17, 2019.[105]  I heard post-trial argument on December 17, 2019 and issued my Memorandum Opinion on liability April 3, 2020.[106]  The Damages Trial took place over one additional day, on September 22, 2020.[107]  Post-trial briefing concluded on November 25, 2020.[108]  At post-trial oral argument on December 8, 2020, I requested a supplemental stipulation from the parties with respect to Millennium's percent ownership of Maverick and the timing and amount of payments made by Millennium pursuant to the Collaboration Agreement, which I received on December 17, 2020.[109]  I considered this matter submitted for decision as of that date.  In March, the parties informed me by letter of Millennium's intent

---

[101] *See* Verified Compl., Dkt. No. 1; Mot. for Temporary Restraining Order, Dkt No. 1.

[102] *See, e.g.*, Judicial Action Form, Dkt. No. 26.

[103] *See* Mot. to Intervene, Dkt. No. 110.

[104] *See, e.g.*, Judicial Action Form, Dkt. No. 130; Verified Compl. in Intervention, Dkt. No. 135.

[105] *See, e.g.*, Judicial Action Form, Dkt. No. 279.

[106] *See, e.g.*, Judicial Action Form, Dkt. No. 350.

[107] *See generally* Damages Trial Tr.

[108] Post-Trial Reply Br. on Damages Awardable to Millennium, Dkt. No. 397 [hereinafter Millennium Reply Br.].

[109] *See* Tr. of Post-Trial Oral Argument via Zoom 126:12–127:3, Dkt. No. 402 [hereinafter Damages Post-Trial Tr.]; *see generally* Stip., Dkt. No. 401.

to exercise the Warrant to purchase Maverick.[110] I requested another supplemental stipulation of fact with respect to the status of that transaction and Maverick's ownership structure.[111] I received that supplemental stipulation on March 29, 2021.[112]

## II. ANALYSIS

### A. Standard of Review

The scope of fraud damages under our law is broad. However, while a plaintiff may recover for "any injury" that is the direct and proximate result of the defendant's false representation, liability is generally limited to those injuries which were "within [the defendant's] contemplation when the fraud was committed.[113]

In cases of fraud and fraudulent inducement, Delaware courts recognize two primary approaches for measuring the harm proximately caused by the defendant's fraud—benefit-of-the-bargain damages and out-of-pocket damages.[114] Benefit-of-the-bargain damages are equal to "the difference between the actual and the represented values of the object of the [fraudulent] transaction."[115] This method

---

[110] *See* Ltr. from Steven Fineman, Dkt. No. 406; Ltr. From John P. DiTomo, Dkt. No. 407.
[111] Ltr. to Counsel, Dkt. No. 408.
[112] *See generally* Stip., Dkt. No. 409.
[113] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1077 (Del. 1983); *see also Harman v. Masoneilan Int'l, Inc.*, 442 A.2d 487, 499 (Del. 1982) ("The damages available for deceit or fraudulent misrepresentation are generally limited to those which are the direct and proximate result of the false representation . . . ").
[114] *Stephenson v. Capano Dev., Inc.*, 462 A.2d at 1076 (citations omitted).
[115] *Id.*

24

should "put the plaintiff in the same financial position that [the plaintiff] would have been in if the defendant's representations had been true."[116] Out-of-pocket damages are equal to "the difference between what [the plaintiff] paid and the actual value" of what the plaintiff received.[117] Awarding out-of-pocket damages should "restore the plaintiff to [their] financial position before the transaction occurred."[118] Regardless of the approach taken, the goal is to make the plaintiff whole.[119]

A plaintiff bears the burden of proving damages by a preponderance of the evidence.[120] Damages are measured at the time of the fraudulent transaction.[121]

The fact of damages must be proven "with reasonable certainty,"[122] but mathematical certainty is not required.[123] Although the Court "may not set damages based on mere speculation or conjecture,"[124] once the fact of damage has been proven, "Delaware courts place the burden of uncertainty where it belongs."[125] "[S]o

---

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] *See, e.g.*, *LCT Cap., LLC v. NGL Energy Partners LP*, 2021 WL 282645, at *9 (Del. Jan. 28, 2021), *corrected* (Mar. 4, 2021).

[120] *See, e.g.*, *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016).

[121] *Stephenson v. Capano Dev., Inc.*, 462 A.2d at 1077.

[122] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015).

[123] *See Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. July 10, 2003). ("The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage.")

[124] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *24 (Del. Ch. Jan. 25, 2013) (quoting *Medek v. Medek*, 2009 WL 2005365, at *12 n.78 (Del. Ch. July 1, 2009)).

[125] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020).

long as a plaintiff provides a reasonable method to calculate damages, the risk that such cannot be determined with mathematical certitude falls on the wrongdoer, not the wronged."[126] A moment's reflection demonstrates that the perpetrator of an intentional tort should not get the benefit of uncertainty in the quantum of harm he has caused.

Here, Millennium seeks monetary damages for Harpoon's fraud. Accordingly, the burden is on Millennium to demonstrate the resulting damage, which is an element of its fraud claim.[127] There is no doubt that this element is satisfied here; the only question is the appropriate amount of damages, which are difficult but not, I find, impossible to quantify.

*B. Millennium has Proven the Fact of its Damages*

Millennium must prove the fact of its damages with reasonable certainty. I previously found that Harpoon's fraudulent representations as to the scope of the Maverick Field induced Millennium to make a $10 million investment in Maverick's Series B preferred stock, to pay another $33 million under the Warrant Agreement, and to commit $69 million for research and development funding over the four years following the transaction date.[128] At the Liability Trial, Millennium witnesses credibly testified that Takeda would have considered the investment absurd if it

---

[126] *Great Hill*, 2020 WL 948513, at *20.
[127] *See id.*
[128] *See supra* 13–15.

imagined it was investing in the intellectual property around a single method or path to conditionality while leaving the field open to competition from Harpoon.[129] Additionally, following the Maverick spin-out, both Evnin and Baeuerle had extensive access to Maverick's research at the same time that Harpoon was developing competing technology.[130] Evnin and Baeuerle, while they were principals at Harpoon, participated in Maverick board meetings, joint steering committee meetings, and scientific advisory board meetings.[131] Baeuerle worked as an "acting CSO" at Maverick, and Evnin also worked intimately with the scientists at Maverick to develop Maverick's COBRA molecule.[132] Maverick witnesses testified that the company only granted this level of access based on the understanding that Harpoon was limiting its own work to inherently active platforms.[133] Although I did not find sufficient proof that Baeuerle and Evnin purloined Maverick technology on behalf of Harpoon, the level of access they enjoyed at Maverick demonstrates that Millennium did not anticipate they would compete with, rather than promote, Maverick's COBRA molecule

Harpoon disputes that this evidence is sufficient to prove the fact of Millennium's damages.[134] Specifically, per Harpoon, any damages calculation that

---

[129] *Maverick I*, at *36.
[130] *Id.* at *14.
[131] *Id.*
[132] *Id.*
[133] *Id.*
[134] Harpoon Pre-Trial Damages Br. 10–24.

assumes Maverick and Harpoon will ultimately bring competing products to market would be so speculative as to vitiate damages entirely.[135]  I agree that damages in this case are difficult to quantify, but that difficulty alone cannot render the fact of Millennium's damages mere speculation.[136]  When it entered the build-to-buy, Millennium made a risky bet, which I have described as similar to purchasing a lottery ticket.  It had expectations as to the odds of success, and as to what the prize would be worth.  Here, Millennium reasonably believed that the Maverick Field was a broad ring fence protecting its investment from Harpoon.[137]  Millennium also expected to have the expertise of Baeuerle and Evnin and their associated industry connections.[138]  Due to Harpoon's fraud, however, it did not receive the benefit of that bargain.[139]  Harpoon's fraud allowed it to compete directly with Maverick in the inducible field.  This altered the value of the potential prize and thus, the value of the lottery ticket itself.

---

[135] *Id.* 14, 23; Damages Post-Trial Tr. 84:6–84:13.  I note, however, that this argument does not appear in the post-trial briefing.

[136] *See, e.g.*, *Tanner v. Exxon Corp.*, 1981 WL 191389, at *1 (Del. Super. Ct. July 23, 1981) ("Reasonable certainty is not equivalent to absolute certainty; rather, the requirement that plaintiff show defendant's breach to be the cause of his injury with 'reasonable certainty' merely means that the fact of damages must be taken out of the area of speculation.") (citations omitted).

[137] *See Maverick I* at *26–*27, *102–*03.

[138] *See id.* at *95 (describing the access Millennium permitted Evnin and Baeuerle as "inexplicable" if it knew that they intended to work on competing projects at Harpoon).

[139] *See id.* at *103 (noting that Millennium may not have invested in Maverick at all "without the broad 'ring fence' around conditionality that it believed Maverick would enjoy"); *see also Tam v. Spitzer*, 1995 WL 510043, at *10 (Del. Ch. Aug. 17, 1995) (finding "the record clearly establishe[d] that the plaintiff was damaged" where the plaintiff "would never have purchased at all," but for the defendant's fraud).

To calculate Millennium's damages, then, is to calculate the difference between two lottery tickets: the ticket Millennium thought it had purchased, and the ticket it received. Because I find that some damage to Millennium has occurred, it has satisfied its burden to show the fact of its damages.

*C. The Amount of Damages*

Having proven the fact of its damages, Millennium must also provide a basis from which this Court can make a "responsible estimate" of the amount of damages.[140] Certainty is not required "where a wrong has been proven and injury established."[141] Damages are measured as of the date of the established injury.[142] I found the assistance from the parties' experts in calculating damages of limited utility—their respective estimates differ by, at best, over $100 million. Although I decline to adopt the valuations offered by either party, expectation (or benefit-of-the-bargain) damages are an appropriate remedy for fraud,[143] and I employ that methodology here. The proper measure of damages is thus the difference between the value of Millennium's investment in Maverick as it was represented to

---

[140] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010), *aff'd sub nom*, *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

[141] *Id.* (citations omitted); *see also Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020); *Medicalgorithmics S.A. v. AMI Monitoring, Inc.*, 2016 WL 4401038, at *26 (Del. Ch. Aug. 18, 2016).

[142] *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1076 (Del. 1983).

[143] *See Great Hill*, 2020 WL 948513, at *18 (noting that "[b]oth contract and tort law . . . conceive of damages as the pecuniary consequences of the breach or tort").

Millennium by Harpoon, and the value of what Millennium actually received—the two lottery tickets I have previously described—as of 2017, when the fraud occurred.

For context, I briefly revisit Nachtwey's Capital Markets Approach and Rao's rebuttal to it.[144] Nachtwey focused on the then-future value of Maverick in 2021 as the touchstone of Millennium's damages. To calculate the value of what Millennium reasonably expected, Nachtwey took Millennium's projected investment in Maverick as of the time of the tort, in 2017, and added value at what he represents is Maverick's cost of capital, 35%, up to the time for exercise of the Warrant in 2021.[145] Nachtwey thus values Millennium's investment in Maverick, sans fraud, at $220.19 million as of the Warrant's exercise date in 2021.[146] He then adds to this figure the implied value of the 80.1% of Maverick that Millennium would acquire by exercise of the Warrant, based on the exercise price of $350 million.[147] This sum provides an enterprise value for Maverick itself, post-exercise and absent fraud, of $500.54 million.[148]

He then derives the value of Millennium's investment from Maverick's enterprise value in the event of Takeda's Nightmare.[149] He assumes that without the

---

[144] The Capital Markets Approach purports to quantify Millennium's expectation damages. *Supra* text accompanying note 85.
[145] *See* JX 1421, at 13–14.
[146] JX 1059, at 57.
[147] *See id.*
[148] *See* JX 1421, at 14.
[149] *See id.* 15–16.

broad non-compete Maverick and Harpoon will split the inducible-field market, reducing Maverick's value by half, below the exercise price of the Warrant.[150] This leaves Millennium with a 19.9% interest in a Maverick of diminished value.[151] Maverick's post-fraud value, under this theory, is slightly greater than $250 million, of which Millennium's share is around $50 million.[152] Millennium's damages are the difference between Millennium's interest in Maverick without fraud (over $220 million) and with (just under $50 million), i.e. $170.36 million.[153] By adjusting to present value as of the supplemental report, Nachtwey arrives at a damages figure of 146.65 million.[154]

I decline to adopt this valuation. First, computing Millennium's damages as of 2017 by deriving a value for *Maverick* in 2021 by applying a cost-of-capital value of thirty-five percent does not value Millennium's investment as of the time of the tort—using Nachtwey's methodology is effectively to award Millennium pre-judgment interest at 35% from the time of the tort. Further, a measure of damages that includes the Warrant exercise price and a component for non-exercise thereof is speculative and shows, to my mind, the error of valuing Maverick, rather than Millennium's investment therein, as the measure of damages. We know the value

---

[150] *See id.*
[151] *See id.* 16.
[152] *See id.*
[153] *See id.*
[154] *Id.*

of the Warrant at the time of the tort—$33 million was the negotiated price. That gave Millennium a right—to exercise or not. In fact, Millennium has elected to exercise this right.[155]

In any event, based upon what he finds to be the value of Maverick as of the exercise time of the Warrant in 2021, deducted from the value as he opines it would have been absent the fraud, Nachtwey arrives at a damages figure of $146.65 million.[156] In other words, per the Plaintiff, Millennium invested approximately $100 million, has received 19.9% of Maverick, which has some value, and yet has suffered *$146 million* in damages. I reject this analysis.

Harpoon urges me to find that Nachtwey's valuation is so convoluted that Millennium is not entitled to damages because it has failed to carry its burden of proof as a matter of law.[157] "The quantum of proof required to establish the amount of damage is not as great as that required to establish the fact of damage."[158] I have already provided my reasons for finding that Millennium has met its burden of proof with respect to damages.[159] As a result of Harpoon's fraud, Millennium did not receive all that it reasonably expected from its investment.

---

[155] On January 7, 2021, Millennium served an exercise notice of its intent to purchase the remaining 80.1% of Maverick. *See* Stip. ¶¶ 66–67, Dkt. No. 409. This fact plays no part in my damages, calculation, however.

[156] *See* JX 1059, at 60; JX 1421, at 16.

[157] *See, e.g.*, Harpoon's Post-Trial Damages Br. 36, Dkt. No. 394.

[158] *Total Care Physicians, P.A. v. O'Hara*, 2003 WL 21733023, at *3 (Del. Super. Ct. July 10, 2003).

[159] *Supra* 29–32.

Furthermore, at oral argument, Harpoon conceded that it would not be inappropriate for me to "start with Nachtwey's $146 million, . . . pick a number" representing the likelihood of competition, and reduce the award by that amount.[160] I take this to mean that the Plaintiff's proof of damages is not so lacking, even in Harpoon's view, as to completely extinguish Millennium's claim to damages. Accordingly, I do not find that Millennium has failed to meet its burden of proving a measure of damages by a preponderance of the evidence. Harpoon also argues that any investment in Maverick is so speculative, and had such a low probability of success, that damages are unsupportable.[161] I reject this argument as well.

The parties, in an arm's-length transaction between sophisticated entities represented by counsel, had no trouble valuing Millennium's investment as of 2017 with the broad non-compete Millennium expected. Millennium paid $10 million for 19.9% ownership of Maverick, $33 million for the Warrant exercisable in 2021, and agreed to future investments in Maverick (the build-to-buy) that, discounted to then-present value, total around $52 million. In other words, the parties negotiated the value of Millennium's investment, with the broad non-compete, at around $95 million.[162] *Pace* Harpoon, that valuation had the low probability of success built

---

[160] Damages Post-Trial Tr. 93:20–93:24. Harpoon suggested twenty-five percent. 93:24–94:1.
[161] *See, e.g.*, Harpoon's Post-Trial Damages Br. 9–11.
[162] This includes the three income streams Millennium contributed in 2017 at their then-present value: the $10 million worth of shares in Maverick, the Warrant priced at $33 million, and the

into the investment price.[163] What, then, is the value of what Millennium actually got, an investment in a Maverick unprotected by the broad non-compete? While Millennium did not receive the protection that a broad, four-year non-compete would have provided, it did not receive nothing. So, I find it helpful to return to my simplistic model of two lottery tickets.

What was the value of that first lottery ticket, with the expected broad non-compete? As just described, the record reflects a negotiated value of $95.4 million. Built into this value is the probability that the product will never be monetized, and that the Warrant may prove valueless. To determine damages, I must deduct from this figure the value of what Millennium *actually* got, the second lottery ticket with the narrow non-compete foisted onto Millennium by Harpoon's fraud. The odds of winning the lottery with this second ticket do not change; monetization of the technology is still a long shot. What does change is the potential payout of a win. This is because the second lottery ticket permits the possibility, if Harpoon is able to monetize *its* product, that Maverick will find itself with a contemporary competitor. Thus, the value of the first ticket is determined by the risk of no pay-out in light of the value of the pay-out: the value of a monetized product without

___

payments Millennium agreed to under the Collaboration Agreement. The payments continue until the earlier of the Warrant Expiration Date or the Warrant Exercise, as defined in the Warrant Agreement. *See* JX 2 §§ 1.65, 5.2. I reduce the payments to their 2017 value using a discount rate of 6.25%, the legal interest rate in Delaware in January 2017. *See* 6 *Del. C.* § 2301(a). The sum of these contributions is $95,376,949.51.

[163] Damages Post-Trial Tr. 91:18–92:13.

competitors in its market. The value of the second ticket is comparatively diminished by the risk of a different pay-out; entering a market in competition with a direct and better-known competitor, Harpoon, with its own product. That is Takeda's Nightmare—winning the lottery but finding the prize materially reduced due to Harpoon's competition.

What is the difference in value of Maverick with the market to itself, versus Maverick and Harpoon splitting the market? Nachtwey suggested that "splitting the market" would diminish the pay-out for Millennium by half, and I adopt that metric. I find this fifty-percent reduction reasonable in light of the record, which does not permit a more precise determination. Accordingly, I conclude that the value of Millennium's investment, with Takeda's Nightmare a certainty, would have been $47.7 million.[164]

I may not simply end the analysis there and assign fraud damages at half Millennium's investment. That is because the fraud itself did not *guarantee* Takeda's Nightmare. As of 2017, the ability of Maverick to compete in the inducible field—the possibility Millennium thought it was avoiding by negotiating for the broad non-compete—was not 100%. If the broad non-compete is looked at as insurance against Takeda's Nightmare, the value of that insurance is determined by the likelihood that the Nightmare would come to pass, as of the time of the

---

[164] Half of $95,376,949.51, representing Takeda's Nightmare, is $47,688,474.75.

agreement. That likelihood was less than 100% and the damages should be reduced accordingly. Harpoon argues (despite the fact that Takeda's Nightmare has now come to pass) that Harpoon's ability to develop competing technology as of the date of the tort was limited—Harpoon's counsel at argument put it at one-in-four, or less.[165] However, I find Harpoon too modest. Harpoon itself had developed the inducible T cell technology, which it transferred to Maverick. Harpoon retained essential know-how in the field, aided by Doctors Baeuerle and Evnin. Certainly, the fact that Harpoon fraudulently structured a cryptic ability to compete showed it has some confidence in its ability to do so. The fact that Harpoon has in fact created a competing product, while not applicable to the damages analysis here, suggests that Takeda's Nightmare, as of 2017, was not such a long shot as Harpoon suggests. A buyer might not pay full price to avoid the possibility of Takeda's Nightmare, but I do not perceive that applicable discount to be greater than 20%. Accordingly, I reduce the damages figure of $47.7 million by that amount.

Of course, this discount relies (as does the 50% competition-based reduction of value) on inferences from the record, and not mathematical certainty. Such certainty is not possible in these circumstances. That uncertainty cannot be used to

---

[165] *See generally* Post-Damages Trial Tr. 93:20–95:5. Rao assumed the chance was one-in-ten. *See* JX 1622, at 63; Damages Trial Tr. 190:15–193:13.

benefit a fraudster, however.[166] It is important to remember that Millenium did not volunteer to invest in an entity in competition in the inducible field with Harpoon—it did so involuntarily due to fraud.

Accordingly, I find that what Millennium reasonably expected—an investment that, if successful, would result in initial market dominance, to have been worth $95.4 million when made. I find that what it got was an investment that risked contemporaneous competition in that market from Harpoon, worth (if that contemporaneous competition came to pass) $47.7 million. Millennium's damages are that difference, discounted by what a buyer would pay to avoid the possibility of such competition, in light of the circumstances obtaining at the time of the tort, which I find to require a 20% discount. Reducing the $47.7 million diminution by 20% results in damages for receiving the narrow rather than broad non-compete at $38.2 million.[167] Millennium's expectation damages are $38.2 million, therefore.

### III. CONCLUSION

I award damages to Millennium in the amount of $38.2 million, together with pre-judgment interest, calculated as set forth in 6 *Del. C.* § 2301(a). The parties should provide an appropriate form of Order.

---

[166] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2020 WL 948513, at *20 (Del. Ch. Feb. 27, 2020).

[167] 80% of $47,688,474.75 is $38,150,779.80.